1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PHONG THANH NGUYEN,

              Petitioner,

     v.

BRUCE SCOTT, Warden, Northwest ICE

Processing Center; CAMMILLA

WAMSLEY, Enforcement and Removal

Operations, Seattle Field Office Director, U.S.

Immigration and Customs Enforcement;

KRISTI NOEM, Secretary, U.S. Department

of Homeland Security,

              Respondents.

Case No. 2:25-cv-01398

ORDER GRANTING PRELIMINARY
INJUNCTION

## I.    INTRODUCTION

Petitioner Phong Thanh Nguyen seeks emergency relief from this Court to obtain his

release from immigration detention and prevent his deportation to an unknown third country.

Dkt. 25. Petitioner is a refugee of Vietnam who fled to the United States as a child in 1975 and

became a legal permanent resident ("LPR") in 1978. After Petitioner was convicted of assault in

ORDER GRANTING PRELIMINARY INJUNCTION - 1

1999, an Immigration Judge ("IJ") ordered his removal to Vietnam. But because Vietnam refused to repatriate its citizens if they had left the country before 1995, Petitioner's deportation was never carried out. After the Supreme Court held in *Zadvydas v. Davis*, 533 U.S. 678 (2001), that the Immigration and Nationality Act ("INA") does not allow indefinite detention of non-citizens with removal orders, Petitioner was released from custody on orders of supervision. On July 16, 2025, Immigration and Customs Enforcement ("ICE") detained Petitioner at a routine check-in. ICE claims that Petitioner's removal to Vietnam is now reasonably foreseeable, justifying his detention.

On July 24, 2025, Petitioner filed a petition for writ of habeas corpus and a motion for a temporary restraining order ("TRO"). Dkt. 1; Dkt. 2-1. The Court granted an ex parte TRO, Dkt. 8, followed by a second TRO after hearing from all parties. Dkt. 22. The Court prohibited respondents from removing Petitioner to a third country while the temporary orders were in effect but did not order his release from detention.

Petitioner then moved for a preliminary injunction. Dkt. 25. Again, he requested that the Court grant his release and bar Respondents from removing him to a third country without due process or where he would face unconstitutional imprisonment. *See id.* Respondents Cammilla Wamsley, Kristi Noem, and the Department of Homeland Security (DHS) opposed the motion. Dkt. 37. Respondents maintain that they do not intend—at this time—to remove Petitioner to a country other than Vietnam, that Petitioner is unlikely to succeed on the merits because there is now a significant likelihood he will be removed to Vietnam, and that Petitioner's request for release from custody should not be granted, as it requests the ultimate relief demanded by his habeas petition. *See id.*

Having considered the record and the arguments of the parties, the Court concludes that Petitioner is entitled to the relief sought and GRANTS the motion for preliminary injunction for the reasons set forth below.

## II.     FACTUAL FINDINGS

Because neither party requested an evidentiary hearing, the Court has made the following findings of fact based on the written evidence submitted by the parties. The Court finds these facts by the preponderance of the evidence.

### A.     Petitioner Nguyen's Removal Proceedings

#### 1.     *Petitioner's Life Before Re-Detention*

1.     Petitioner Phong Nguyen was born on June 6, 1970 in Saigon, Vietnam. Dkt. 27 ¶ 2. Petitioner's father served alongside United States forces during the Vietnam War. Dkt. 30 ¶ 3. His family fled Vietnam immediately after the fall of Saigon in 1975. *Id.*

2.     Petitioner entered the United States with his parents and siblings on July 25, 1975. Dkt. 26-10 at 2; Dkt. 27 ¶ 2. They were among the first group of refugees from Vietnam to be resettled in the United States. Dkt. 27 ¶ 2.

3.     Petitioner became a LPR in 1978. Dkt. 27 ¶ 3.

4.     Before Petitioner's recent detention, he lived in Seattle with his elderly parents. Dkt. 27 ¶ 4; Dkt. 30 ¶ 5. He supports his parents, assisting them with medical appointments, medication management, household chores, and transportation. Dkt. 30 ¶ 5.

5.     Petitioner also cares for his 32-year-old daughter, who has a "rare and medically complex" genetic disorder, Prader-Willi Syndrome, that impacts his daughter's physical health, cognitive abilities, and behavior, and requires "constant supervision." Dkt. 27 ¶ 5; Dkt. 30 ¶ 6; Dkt. 32 ¶ 2. He has jointly provided this care with his daughter's mother since his daughter's birth. Dkt. 27 ¶ 5. Dkt. 32 ¶¶ 3–4, 7–8.

6.      Petitioner works full time for Best Plumbing in Seattle. Dkt. 27 ¶ 6; Dkt. 30 ¶ 6. He has worked there for more than a decade. Dkt. 30 ¶ 7; Dkt. 33 ¶ 3.

*2.      Petitioner's History of Detention*

7.      In December 1999, Petitioner was convicted of assault in the second degree. Dkt. 26-2 at 2; Dkt. 14 ¶ 4.

8.      The government began removal proceedings against Petitioner in February 2000 and he was taken into ICE custody around July of that year. Dkt. 14 ¶ 5; Dkt. 31 ¶ 3.

9.      On October 4, 2000, an Immigration Judge ("IJ") ordered Petitioner deported to Vietnam. Dkt. 14 ¶ 6; Dkt. 26-4 at 2.

10.     On September 18, 2001, the Honorable Marsha J. Pechman, United States District Judge for the Western District of Washington, found that Petitioner's continued detention was statutorily unauthorized under *Zadvydas v. Davis* and granted his release. Dkt. 26-3 at 2, 9.

11.     Petitioner had been detained for a little more than a year. Dkt. 31 ¶ 3. He was released on an order of supervision. *Id.*

12.     On December 13, 2002, Petitioner was convicted of Unlawful Possession of a Weapon and an Anti-Harassment/Protection Order violation. Dkt. 26-4 at 2. After serving his sentence, he was returned to immigration custody on August 26, 2003. *Id.*

13.     On January 9, 2004, Petitioner was released on a new order of supervision. Dkt. 26-7. He had been detained for around five months. *See* Dkt. 26-7.

*3.      Petitioner's Re-Detention*

14.     Since Petitioner's release from custody, he has complied with all the requirements of his order of supervision for more than two decades. Dkt. 27 ¶ 7; Dkt. 31 ¶ 4.

15.     According to the declaration of Jamie S. Burns, the Acting Assistant Field Office Director for ICE Enforcement and Removal Operations in Tacoma, Washington, on June 18,

2025, ICE Enforcement and Removal Operations ("ERO") Seattle contacted ERO Headquarters Removal and International Operations ("RIO") to ask if there was a significant likelihood that Petitioner could be removed in the reasonably foreseeable future. Dkt. 14 ¶ 12.

16.     According to the Burns declaration, on that same day, "the Middle East and Eastern Africa Unit"—which Burns attests covers removals to Vietnam—advised of the government's position "that there is currently a significant likelihood for removal in the reasonably foreseeable future . . . as to all Vietnamese citizens, regardless of date of entry." *Id.* ¶ 13. Counsel for Respondents affirmed at oral argument that this remains the government's position.

17.     In June 2025, Petitioner appeared for his regularly scheduled check-in, a requirement of his order of supervision. Dkt. 27 ¶ 8; Dkt. 31 ¶ 4.

18.     At the check-in, an ICE officer handed Petitioner paperwork and asked him to complete it and return it on July 15, 2025. Dkt. 27 ¶ 8. The paperwork was the self-declaration form for Vietnam, which is a required part of the documentation package the U.S. government must submit to Vietnam to request the issuance of travel document to deport a Vietnamese citizen. *Id.*; Dkt. 26-6 at 5, 8–9.

19.     The officer also asked Petitioner questions about whether he had any living relatives in Vietnam and where in Vietnam he had lived. Dkt. 27 ¶ 9. The officer asked whether, if Petitioner was deported, Vietnam is the country he would like to be deported to. *Id.* Petitioner said yes. *Id.*

20.     On July 15, Petitioner returned to the ICE office with the completed forms. Dkt. 26-8; Dkt. 27 ¶ 10; Dkt. 31 ¶ 5.

21.     An ICE officer then instructed Petitioner to return the next day with two passport photos. Dkt. 27 ¶ 10. Petitioner asked why the officer needed the photos. *Id.* The officer

responded that they would be sent to the Vietnamese Embassy to "see if you are deportable." *Id.* Petitioner asked if he was deportable and the officer responded, "Well, it's starting to open up." *Id.*

22.     On July 16, Petitioner returned to the office with the photos, accompanied by his family. Dkt. 27 ¶ 11; Dkt. 30 ¶ 7.

23.     Petitioner's brother-in-law received a phone call while the family was waiting for Petitioner to return to the waiting area. Dkt. 31 ¶ 8. It was Petitioner's coworker, who had received a call from Petitioner saying that he was upstairs in handcuffs and in custody. *Id.*

24.     Petitioner had been handcuffed and placed into a holding cell. Dkt. 27 ¶ 11. He was later brought to the Northwest ICE Processing Center ("NWIPC"). *Id.* ¶ 12; Dkt. 31 ¶ 9.

25.     While in the holding cell, Petitioner was provided with a written "Notice of Revocation of Release." Dkt. 13-1 at 2. The notice stated that ICE had determined there were "changed circumstances" in Petitioner's case and "you can be removed from the United States pursuant to an outstanding order of removal against you." *Id.* The only reason provided for this determination was the statement: "Your case is under current review by the Government of Vietnam for the issuance of a travel document." *Id.* Counsel for Respondents later conceded at oral argument that this statement was false, and ICE had not requested a travel document for Petitioner at the time he was detained. Dkt. 37 at 5.

26.     Although Petitioner later attested that he was not provided a copy of the notice, Dkt. 27 ¶ 15, the document contains a certificate of service where the deportation officer certified that he had served Petitioner with the notice at the "Seattle Holding Room" at 3:00 p.m. on July 16, 2025. Dkt. 13-1 at 3. The certificate of service is signed by Petitioner and dated July 16, 2025. *Id.* The preponderance of the evidence shows that, even if Petitioner was not allowed

to keep a copy of the notice, or does not remember receiving it, he was at least shown it at the time of his detention.

27.    Once Petitioner arrived at NWIPC, a booking officer took his photo and fingerprints. Dkt. 27 ¶ 13.

28.    After the booking process, an ICE supervisor met with Petitioner and went over the history of his removal order, detention, and compliance with the conditions of his supervision. *Id.* ¶ 14. The supervisor told Petitioner that they were going to finish his paperwork to send to Vietnam and then wait and see if Vietnam would accept him. The supervisor said that Petitioner would remain in detention until Vietnam decided whether to take him. *Id.* The supervisor did not explain any reasons for believing Vietnam would now accept Petitioner. *Id.* ¶ 15.

29.    Petitioner remains detained at NWIPC. *Id.* ¶ 12. Petitioner did not speak to another ICE officer about his case until July 29, 2025, after this habeas action was filed, as explained below. *Id.* ¶ 16.

**B.    Nguyen's Habeas Petition**

30.    On July 24, Petitioner filed this habeas petition. Dkt. 1. He also moved for a TRO. Dkt. 2.

31.    The Court issued an ex parte TRO enjoining Respondents from removing Petitioner to a country other than Vietnam until a hearing could be held. Dkt. 8.

32.    Respondents filed their opposition to the TRO motion on July 26. Dkt. 13.

33.    To support their opposition, Respondents submitted a declaration from Jamie Burns, Acting Assistant Field Office Director at the ERO office in Tacoma, Washington. Dkt. 14 ¶ 1.

34.     Burns stated that Petitioner's order of supervision was revoked because ICE had determined that he could be removed on the outstanding order of removal against him. *Id.* ¶ 16. Like the notice of revocation letter, Burns attested that Petitioner's case was "currently under review by the Government of Vietnam for issuance of travel documents." *Id.*

35.     Counsel for Respondents conceded at oral argument that this statement was not true, and ICE had not requested a travel document for Petitioner at either the time of his detention or the filing of the sworn Burns declaration. Dkt. 37 at 5.

36.     This false representation to the Court reflects adversely on the overall credibility of Burns's written testimony, although the Court commends counsel for promptly correcting the record.

37.     Burns concluded his first declaration by stating: "ICE anticipates that a travel document will be issued and [Petitioner] will be removed to Vietnam shortly thereafter." Dkt. 14 ¶ 17.

38.     Respondents also offered a supplemental declaration from Jessie D. Gonzalez, Detention and Deportation Officer for the ERO Removal Management Division (East). Dkt. 18-1.

39.     Gonzalez stated that "[t]he Government of Vietnam has agreed to increase cooperation with the United States and issue travel documents in less than 30 days." *Id.* ¶ 6.

40.     Gonzalez offered a limited set of statistics: "In Fiscal Year 2024 (FY24), ICE removed 58 final order Vietnamese citizens to Vietnam. As of July 25, 2025, ICE has removed 368 final order Vietnamese citizens to Vietnam in Fiscal Year 2025 (FY25). In FY25, ICE has requested travel documents in 301 cases involving Vietnamese citizens. In 225 cases, ICE obtained the necessary travel documents from the Government of Vietnam. Of those 225 cases, 154 entered the United States before July 12, 1995." *Id.* ¶¶ 7–8.

41.     At 3 p.m. on July 29, 2025, the Court held a hearing on the TRO motion. Dkt. 20.

42.     That same day, "shortly before the hearing[,]" Petitioner called his attorney, Jennifer Pasquarella. Dkt. 26 ¶ 10. He informed her that an ICE officer had requested that he sign a form. *Id.* Pasquarella had previously instructed him not to sign any paperwork before first discussing with her. *Id.*; Dkt. 27 ¶ 16.

43.     Pasquarella spoke with a deportation officer, Officer DeCastro, who told her that the form was an I-217, Information for Travel Document or Passport. Dkt. 26 ¶ 10. Pasquarella asked the officer why he was requesting that Petitioner complete the form. *Id.* DeCastro responded that it was necessary to request a travel document from Vietnam. *Id.* When Pasquarella asked if that meant ICE had not yet requested a travel document, DeCastro confirmed they had not. *Id.* DeCastro did not know why one had not already been submitted and explained that he had just been assigned Petitioner's case. *Id.* Pasquarella requested that she see the form, and DeCastro complied. *Id.*

44.     After seeing the form, Pasquarella advised Petitioner to complete it, which he did. *Id.* ¶ 11; *see also* Dkt. 26-9; Dkt. 27 ¶ 16.

45.     DeCastro then showed Petitioner the self-declaration form from Vietnam. Dkt. 27 ¶ 17. Petitioner told him that he had already completed the form, and the officer found the completed form in his file. *Id.*

46.     DeCastro also asked Petitioner questions about his family in Vietnam; any addresses where he would live in Vietnam; and whether he has a Vietnamese birth certificate. *Id.* ¶ 18. Petitioner responded that he has no known family in Vietnam, no previous addresses, and is unsure if he had a birth certificate. *Id.*

47.     DeCastro reviewed Petitioner's file and then stated, "Man, we don't have much information on you from Vietnam." *Id.* ¶ 19.

48.     On August 1, 2025, Petitioner called his counsel around 1 p.m. Dkt. 26 ¶ 18. He called to tell her that a deportation officer had asked him to complete additional paperwork. *Id.* He told counsel that he was presented with a Notice of Revocation of Release and a Service document, which he was allowed to keep. *Id.* The officer informed him that Petitioner was being given the "opportunity to make a statement as to the reasons why he did not think his release should be revoked." *Id.* Petitioner provided a written statement to the officer. *Id.*

49.     Before the Court's hearing on Petitioner's motion for a preliminary injunction, Burns submitted a second declaration. Dkt. 38. Burns has now attested that on August 7, 2025, the travel document request for Petitioner was forwarded to the ICE Attaché for Vietnam for presentation to the Government of Vietnam. *Id.* ¶ 3.

50.     Burns also stated that "ICE is currently seeking to remove Petitioner solely to Vietnam and will not attempt a third country removal unless and until Vietnam denies the pending travel document request." *Id.* ¶ 4.

51.     And, Burns noted, "ICE agrees to provide Petitioner's counsel 24 hours advance notice if the agency decides to pursue a third country removal." *Id.* ¶ 5.

**C.    History of Vietnamese Refugee Removal**

52.     Vietnam has long refused to accept for deportation Vietnamese nationals who came to the United States as refugees before 1995. Dkt. 28 ¶ 7; Dkt. 22 at 7–8 (discussing the history of Vietnamese immigration to the U.S. as recounted in *Trinh v. Homan*, 466 F. Supp. 3d 1077, 1083 (C.D. Cal. 2020)).

53.     Consequently, many Vietnamese nationals who are ordered removed "have continued to live and work in the United States and have regularly checked in with ICE in accordance" with order of supervision conditions. Dkt. 28 ¶ 7.

54.    Over the years, ICE has "undertaken a number of negotiations with the Government of Vietnam to establish a process for regularized removals of final order Vietnamese citizens who entered the U.S." before 1995. Dkt. 14 ¶ 11.

55.    On November 21, 2020, the United States and Vietnam entered into a Memorandum of Understanding ("MOU") regarding pre-1995 immigrants. Dkt. 26-6 at 2, 7.

56.    The purpose of the MOU is to "establish a process of review and issuance of travel documents for Vietnamese citizens ordered removed from the United States and to facilitate the acceptance of all such Vietnamese citizens[.] . . . The scope of this MOU is intended to apply to individuals who arrived in the United States before July 12, 1995." *Id.* at 2.

57.    Section 4 of the MOU is titled "Eligibility for Acceptance of Return." *Id.* at 3. Section 4 states that Vietnam intends to accept the removal of individuals who meet four conditions. The individual must (1) have Vietnamese citizenship and not the citizenship of any other country; (2) have been ordered removed by the United States and finished serving any U.S. prison sentence; and (3) have resided in Vietnam before arriving in the United States and not have the right to reside in any other country. *Id.* at 3–4. The fourth mandatory condition is redacted in the publicly disclosed version of the MOU filed in this litigation, and Respondents have not disclosed any information about what that condition requires. *See id.* at 4.

58.    Sections 5 and 6 of the MOU contain factors that the United States intends to consider before requesting travel documents for a Vietnamese citizen and that Vietnam intends to consider before accepting an individual ordered removed. *Id.* at 4. These factors are also redacted and have not been disclosed in this litigation.

59.    Section 8 of the MOU is titled "Procedures for Verification and Issuance of Travel Documents." Under Section 8 of the agreement, ICE must request appropriate travel documents from Vietnamese officials before removal. *Id.* at 5. The documentation package is

expected to contain a cover letter; the self-declaration form; a copy of the individual's final order of removal; copies of records related to the individual's criminal convictions and incarceration, if applicable; photographs and fingerprints; and copies of citizenship documents such as expired passports, national identity cards, birth certificates, or expired travel documents. *Id.*

60.     After the request for a travel document is received, Vietnam "intends to issue the travel document" within thirty days "when the individual meets the eligibility criteria listed in Section 4 of this MOU." *Id.*

61.     For individuals who do not meet the eligibility criteria, the MOU sets out a process through which the United States and Vietnam will try to "resolve the case," which may include gathering additional information, convening a working group, considering "the humanitarian and family unity factors of the individual ordered removed," and conducting interviews. *Id.* at 5–6.

62.     On June 9, 2025, ICE rescinded its policy of generally finding that pre-1995 Vietnamese immigrants were not likely to be removed in the reasonably foreseeable future. Dkt. 26-13 at 2.

63.     On August 13, 2025, Respondents filed a declaration from Brian J. Casey, the ICE ERO Attaché who serves in Hanoi, Vietnam. Dkt. 41-1. Mr. Casey began his position in November 2024 and is "primarily responsible for coordinating removals to Vietnam and other countries in the S.E. Asia area of operations and for negotiating with foreign government officials on the removal of foreign nationals from the United States." *Id.* at 1–2.

64.     Mr. Casey attests that Vietnam "has not formally denied any ICE request for a travel document since October 2, 2024," and that Vietnam "has not taken more than 30 days to issue a travel document pursuant to any of our requests since mid-February 2025." *Id.* at 2.

65.    This declaration essentially restates the procedures from Section 8 of the MOU. As explained above, under Section 8, when Vietnam concludes the eligibility criteria are met, it is expected to issue a travel document within 30 days. Dkt. 26-6 at 5. When the eligibility criteria are not met, rather than a formal denial, the MOU sets out a multi-step process through which the two countries attempt to resolve the case. *Id.* at 5–6.

66.    Mr. Casey's declaration does not shed any light on the undisclosed eligibility criteria applicable to Petitioner or suggest that those criteria have changed.

**D.    ICE Policy Regarding Removal to Third Countries**

67.    On March 28, 2025, the District of Massachusetts entered a TRO enjoining ICE from "[r]emoving any individual subject to a final order of removal from the United States to a third country, *i.e.,* a country other than the country designated for removal in immigration proceedings" unless certain conditions were met. *D.V.D. v. U.S. Dep't of Homeland Sec.*, CV 25-10676-BEM, 2025 WL 942948, at *1 (D. Mass. Mar. 28, 2025).

68.    On April 18, 2025, the district court issued an order granting the plaintiffs' motion for class certification and motion for preliminary injunction. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 394 (D. Mass. 2025). The preliminary injunction established procedures that DHS and ICE were required to follow before removing a noncitizen to a third country. *See D.V.D. v. U.S. Dep't of Homeland Sec.*, CV 25-10676-BEM, 2025 WL 1453640, at *1 (D. Mass. May 21, 2025) (memorandum offering more guidance on compliance with the preliminary injunction).

69.    On June 23, 2025, the United States Supreme Court stayed the district court's preliminary injunction pending appeal in the First Circuit. *Dep't of Homeland Sec. v. D.V.D.*, __ U.S. __, 145 S. Ct. 2153 (2025).

70.     On July 9, 2025, ICE issued a memorandum updating agency officials on its policy regarding third country removals after the Supreme Court's order in *D.V.D. v. Department of Homeland Sec.*. Dkt. 26-1 at 2.

71.     The policy states that, "[e]ffective immediately, when seeking to remove an [noncitizen][1] with a final order of removal—other than an expedited removal order under Section 235(b) of the Immigration and National Act (INA)—to an alternative country as identified in section 241(b)(1)(C) of the INA, ICE must adhere to Secretary of Homeland Security Kristi Noem's March 30, 2025 memorandum, Guidance Regarding Third Country Removals, as detailed below. A 'third country' or 'alternative country' refers to a country other than that specifically referenced in the order of removal." *Id.*

72.     The policy continues, "[i]f the United States has received diplomatic assurances from the country of removal that [noncitizens] removed from the United States will not be persecuted or tortured, and if the Department of State believes those assurances to be credible, the [noncitizen] may be removed without the need for further procedures. ICE will seek written confirmation from the Department of State that such diplomatic assurances were received and determined to be credible. HSI and ERO will be made aware of any such assurances." *Id.*

73.     In other cases, the policy lays out several procedures ICE must follow. *Id.*

74.     Finally, the policy states that the "Supreme Court's stay of removal does not alter any decisions issued by any other courts as to individual [noncitizens] regarding the process that must be provided before removing that [noncitizen] to a third country." *Id.* at 2–3.

---

[1] "This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'" *Nasrallah v. Barr*, 590 U.S. 573, 578 n.2 (2020) (citing 8 U.S.C. § 1101(a)(3)).

**E.    Deportation of Vietnamese Refugees to Third Countries**

75.    Petitioner's counsel Pasquarella represented several other individuals who were deported to South Sudan following the stay of the preliminary injunction in *D.V.D.*, including Tuan Phan, a pre-1995 Vietnamese immigrant. Dkt. 26 ¶ 17; Dkt. 29 ¶ 5. She attests that during the TRO hearing in that case, the government's counsel claimed that it had "diplomatic assurances" that the deportees would not be persecuted or tortured. *Id.* But her clients have been held incommunicado by the South Sudanese government ever since their deportation. *Id.*

76.    Glenda Aldana Madrid, another attorney for Tuan Phan, submitted a sworn declaration accompanied by a copy of text messages between Mr. Phan's wife and his deportation officer leading up to his deportation. Dkt. 29; Dkt. 29-1. The text messages from Mr. Phan's deportation officer state that he had not submitted the paperwork for a travel document from Vietnam before Mr. Phan was deported to South Sudan. Dkt. 29-1 at 4. The text messages also indicate that neither the deportation officer nor his supervisors knew that Mr. Phan was about to be deported to South Sudan until it happened. *See id.* at 5–7. Ms. Madrid's declaration also confirms that Mr. Phan has been held incommunicado by the government of South Sudan since his deportation. Dkt. 29 ¶ 18.

77.    Petitioner also submitted a sworn declaration from Tin Thanh Nguyen, an immigration lawyer who specializes in cases involving Vietnamese citizens. Dkt. 28 ¶ 7. One pre-1995 Vietnamese immigrant whom Mr. Nguyen represents was recently deported to Eswatini. *Id.* ¶ 19. Mr. Nguyen attests that there "is no evidence in that case that ICE requested a travel document from the Government of Vietnam prior to his deportation." *Id.* He explains that, "[f]irst, his family members in Viet Nam did not receive any communication from the local police which is usually the final step to verify a Vietnamese national's identity before issuance of a travel document." *Id.* Second, the Vietnamese national "never mentioned anything about ICE

obtaining a travel document to his wife who was in frequent communication with him during the period of his immigration custody." *Id.* "Third, it is uncertain whether ICE provided any notice to [the Vietnamese national], either in writing or orally, prior to being deported to Eswatini." *Id.* The attorney noted that the individual's "wife did not hear from him for over 24 hours and only learned of his deportation to Eswatini when she saw Tricia Mclaughlin's, Assistant Secretary for Public Affairs for the Department of Homeland Security ("DHS"), post on X formerly Twitter on July 16, 2025, announcing that ICE had deported five (5) men to Eswatini and included a photo of her husband. He remains incommunicado since his deportation to Eswatini." *Id.*

**F.    Current Delays in Removal for Vietnamese Refugees**

78.    Petitioner's counsel provided a declaration from ICE Officer Romero that was submitted in *Hoac v. Becerra*, 2:25-CV-01740-DC-JDP (HC), 2025 WL 1808697, at *1 (E.D. Cal. June 30, 2025). Dkt. 26 ¶ 13. The declaration states that ICE submitted a travel document request for Hoac, a pre-1995 Vietnamese refugee, on November 3, 2023. *Id.*; *see also* Dkt. 26-11 ¶¶ 4, 14. On December 6, 2023, Hoac was released from custody by DHS on an order of supervision. Dkt. 26-11 ¶ 15. On June 4, 2025, DHS took Hoac into custody for "further processing of the travel document request in anticipation of execution of the removal order[.]" *Id.* ¶ 17. As of June 4, 2025, Vietnam had not yet issued a travel document. Dkt. 26 ¶ 13; *see also* Dkt. 26-11 ¶ 17.

79.    In his declaration, Mr. Tin Thanh Nguyen explains that this year alone, he has worked on or assisted with nearly a hundred cases of pre-1995 immigrants "for whom ICE has requested travel documents from Vietnam." Dkt. 28 ¶ 12. Across these cases, Mr. Nguyen has "yet to see Vietnam issue a travel document within 30 days or less" for a pre-1995 arrival. *Id.* Rather, in his experience, "it can take many months to get any answer from Vietnam about whether it will issue a travel document" for these arrivals. *Id.*

### III.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in his favor, and (4) the relief sought is in the public interest. *Winter*, 555 U.S. at 20. The movant must make a showing on each element of the *Winter* test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). However, "where the 'balance of hardships . . . tips sharply towards the plaintiff,' a plaintiff need only show 'serious questions going to the merits,' rather than likelihood of success on the merits[.]" *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (quoting *All. for the Wild Rockies*, 632 F.3d at 1135). Still, the moving party bears the burden of persuasion and must make a clear showing that he is entitled to relief. *Winter*, 555 U.S. at 22.

Although individual appellate panels have questioned the usefulness of the distinction, the Ninth Circuit distinguishes between "mandatory" and "prohibitory" injunctions. *Hernandez v. Sessions*, 872 F.3d 976, 997–98 (9th Cir. 2017). Prohibitory injunctions maintain the status quo, preventing further constitutional violations. *Id.* at 997. By contrast, mandatory injunctions go further, ordering "a responsible party to 'take action.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Meghrig v. KFC W., Inc.,* 516 U.S. 479, 484 (1996)). A mandatory injunction "'goes well beyond simply maintaining the status quo [and is thus] . . . particularly disfavored.'" *Id.* (quoting *Anderson v. United States,* 612 F.2d 1112, 1114 (9th Cir. 1980)). Accordingly, the Ninth Circuit has held that mandatory injunctions "should not be approved in the absence of a risk of 'extreme or very serious damage.'" *Hernandez*, 872 F.3d at 997 (quoting *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879). Mandatory

injunctions are most likely to be appropriate when "the status quo . . . is exactly what will inflict the irreparable injury upon complainant." *Id.* at 999 (quoting *Friends for All Child., Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n.21 (D.C. Cir. 1984)).

## IV.    CONCLUSIONS OF LAW

### A.    Type of Relief Requested

To start, the Court must consider whether the relief requested demands a prohibitory or mandatory injunction. *See Hernandez*, 872 F.3d at 997–99. Petitioner requests that the Court issue a preliminary injunction that "order[s] his release, enjoin[s] Respondents from removing him to a third country without affording him his statutory and constitutional rights in reopened removal proceedings, and enjoin[s] Respondents from removing him to a third country for a punitive purpose and effect." Dkt. 25 at 8.

From Respondents' perspective, Petitioner requests both forms of injunctions. He seeks a prohibitory injunction to maintain the status quo by barring ICE from removing him to a third country. *Id.* Petitioner's request for release from detention, however, is generally considered a mandatory injunction. *See Betschart v. Oregon*, 103 F.4th 607, 619 (9th Cir. 2024) (determining that injunction requiring release of certain criminal defendants was a mandatory injunction).

But several district courts have recently concluded that releasing a re-detained noncitizen who had been on supervised release preserves rather than alters the status quo. *Phong Phan v. Moises Becerra*, No. 2:25-CV-01757-DC-JDP, 2025 WL 1993735, at *6 (E.D. Cal. July 16, 2025); *Pinchi v. Noem*, No. 25-cv-05632-RMI-RFL, 2025 WL 1853763, at *3 (N.D. Cal. Jul. 4, 2025) (finding the "moment prior to the Petitioner's likely illegal detention" was the status quo). The status quo ante litem is "the last uncontested status which preceded the pending controversy[.]" *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)); *see also*

*Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) ("[T]he 'status quo' refers to the legally relevant relationship between the parties before the controversy arose.") (emphasis removed) (citing *McCormack v. Hiedeman*, 694 F.3d 1004, 1020 (9th Cir. 2012)).

Some courts have thus concluded that similarly situated petitioners "seek a prohibitory injunction because they seek to preserve the status quo preceding this litigation—their physical presence in the United States free from detention." *Domingo-Ros v. Archambeault*, No. 25-CV-1208-DMS-DEB, 2025 WL 1425558, at *2 (S.D. Cal. May 18, 2025); *see also Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *2 (E.D. Cal. Mar. 3, 2025) ("Petitioner had remained out of custody for over five years until his bond was suddenly revoked. It is questionable whether that status quo is properly considered to be detention when the Government suddenly took an allegedly unconstitutional action in rearresting Petitioner without a hearing[.]").

The Court instructed the parties to address this issue in its order partially granting Petitioner's TRO. Dkt. 22 at 13. Respondents referred the Court to the Ninth Circuit's holding in *Senate of State of California v. Mosbacher*, 968 F.2d 974 (9th Cir. 1992). There, the California State Senate sued to compel the Secretary of Commerce to release the adjusted census calculations for the State. *Id.* at 975. The State Senate claimed that the release was required by the Constitution and several relevant statutes. *Id.* The district court granted a preliminary injunction ordering the Secretary to release the adjusted census figures. *Id.* It concluded that the Senate would be irreparably harmed if it was not provided with the adjusted census calculations for use in the redistricting process. *Id.* The court found no harm to the Department, which had already calculated and prepared the adjusted figures, and had been ready to send them out to the states. *Id.*

The Secretary appealed. *Id.* In its opinion, the Ninth Circuit did not discuss "mandatory" versus "prohibitory" injunctions. *See id.* at 978. But when weighing the balance of hardships, the circuit court concluded that if it required the Secretary to release the data, "the Secretary will have lost the whole case for all practical purposes. In general, that kind of judgment on the merits in the guise of preliminary relief is a highly inappropriate result." *Id.* at 978 (citations omitted).

*Mosbacher* is a difficult point of comparison because it was grounded in the Ninth Circuit's outdated approach to preliminary injunctions that was overruled by *Winter*. *See id.*; *see also Winter*, 555 U.S. at 21–22. But the facts of *Mosbacher* are also distinguishable from those here. First, the court did not consider what constituted the "status quo." *See generally Mosbacher*, 968 F.2d at 977–78. But the status quo before the allegedly unlawful act was the Secretary's sole possession of the data. *See id.* at 975, 977–78. Here, by contrast, the status quo before the allegedly unlawful acts was Petitioner's release on an order of supervision. *See, e.g.*, *Phong Phan*, 2025 WL 1993735, at *6 (similar); *Pinchi*, 2025 WL 1853763, at *3 (similar).

Second, as the circuit court explained, were the Secretary ordered to release the data, there would be nothing the Court or parties could truly do to "unrelease" the information if the Secretary prevailed in the end. *Mosbacher*, 968 F.2d at 978 ("[O]nce the data is released, the Secretary will have lost the whole case for all practical purposes.").

The same is not true here. If Petitioner is released, and Respondents ultimately succeed on the merits, they can re-detain him. Before his detention last month, Petitioner had been released on an order of supervision since January 2004. Dkt. 14 ¶ 10; Dkt. 26-7 at 2. He never violated the requirements of the order. Dkt. 27 ¶ 7; Dkt. 31 ¶ 4. And Petitioner has complied with every request ICE has made of him here. He appeared in June 2025 for his regular check-in. Dkt. 27 ¶ 8. He completed a self-declaration form for Vietnam and brought it to his next

appointment. *Id.* ¶ 10. When asked to return the next day with passport photos, he complied again. *Id.* ¶¶ 10–11.

One of the requirements of Petitioner's Order of Supervision is that he "appear in person at the time and place specified, upon each and every request of the Service, for identification and for deportation or removal." Dkt. 26-7 at 2. Given his compliance with every other element of the order, there is no reason to think that he would not comply now. *See* Dkt. 27 ¶¶ 7, 10–11. His release would not preclude ICE from re-detaining him if Respondents prevail on the merits.

Respondents also cited *Chavez v. Murray*, No. 1:25-CV-00198-HBK (HC), 2025 WL 1017678 (E.D. Cal. Apr. 4, 2025). There, the petitioner challenged his "prolonged detention" without a bond hearing. *Id.* at *1. The petitioner had been held for over twenty-two months. *Id.* He moved for a TRO seeking release or a bond hearing. *Id.* The respondent argued that the motion should be denied because he sought "only to alter the status quo by issuing an expedited order that would grant him the ultimate relief he seeks in his petition." *Id.* at *2. The court there agreed and denied the TRO for that reason. *Id.*

*Chavez* is also distinguishable. The status quo was Chavez's detention without a bond hearing, rather than his release. *See id.* at *1–2. But here, the allegedly unlawful act was not something that occurred while Petitioner was detained. *See id.*; *see also* Dkt. 1 ¶¶ 72–77. Rather, the issue is the re-detention itself, which Petitioner claims is unlawful. *See* Dkt. 1 ¶¶ 72–77.

Petitioner therefore seeks a prohibitory injunction. *See e.g.*, *Ariz. Dream Act Coalition*, 757 F.3d at 1061; *Phong Phan*, 2025 WL 1993735, at *6; *Pinchi*, 2025 WL 1853763, at *3. That standard will govern the Court's analysis of his motion.

**B.    Likelihood of Success on the Merits**

Petitioner raises three claims: 1) that his re-detention violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution; the INA, 8 U.S.C. § 1231(a); implementing

regulations, 8 C.F.R. § 241.13; and the Administrative Procedure Act ("APA"), Dkt. 1 ¶ 73;

2) that third-country removal without meaningful notice and opportunity to respond violates the

Fifth Amendment's Due Process Clause, the INA, and the Convention Against Torture ("CAT"),

*id.* ¶¶ 79–80; and 3) that President Trump's third-country removal program imposes punishment

without a criminal trial, in violation of the Fifth and Eighth Amendments, *id.* ¶¶ 82–85. The

Court takes each in turn.

    *1.*    *Re-Detention: The INA and* Zadvydas

       Under the Due Process Clause of the Fifth Amendment to the United States Constitution,

no person shall be "deprived of life, liberty, or property, without due process of law." U.S.

Const. amend. V. "The Fifth Amendment guarantees due process in deportation proceedings."

*Torres-Aguilar v. I.N.S.*, 246 F.3d 1267, 1270 (9th Cir. 2001) (citing *Campos-Sanchez v. I.N.S.*,

164 F.3d 448, 450 (9th Cir. 1999), *superseded by statute on other grounds in Arizmendi-Medina*

*v. Garland*, 69 F.4th 1043, 1053 (9th Cir. 2023)). Thus, the Supreme Court has held that "the

Due Process Clause protects a[] [noncitizen] subject to a final order of deportation[.]" *Zadvydas*,

533 U.S. at 693–94 (citing *Wong Wing v. United States*, 163 U.S. 228, 238 (1896)); *see also*

*Demore v. Kim*, 538 U.S. 510, 523 (2003) (recognizing that Fifth Amendment due process

protections apply to deportation proceedings but noting that "detention during deportation

proceedings [is] a constitutionally valid aspect of the deportation process").

       In *Zadvydas*, the Supreme Court held that the INA does not authorize "indefinite, perhaps

permanent, detention" of noncitizens subject to final orders of removal. 533 U.S. 678, 699

(2001). Applying the doctrine of constitutional avoidance, the Court explained that such an

interpretation was necessary "to avoid a serious constitutional threat[.]" *Id.* As the Court

recognized, "[a] statute permitting indefinite detention of [a noncitizen] would raise a serious

constitutional problem [under] . . . [t]he Fifth Amendment's Due Process Clause[.]" *Id.* at 690.

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Id.* Citing numerous cases, the *Zadvydas* Court observed "that government detention violates that Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections, or, in certain special and narrow nonpunitive circumstances. . . where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id.* (citation modified).

As the Court concluded, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Zadvydas*, 533 U.S. at 699. The "presumptively reasonable" period for detention following a removal order is six months. *Id.* at 701. "And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.*

*Zadvydas* "places the burden on the [noncitizen] to show, after a detention period of six months, that there is 'good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future.'" *Pelich v. I.N.S.*, 329 F.3d 1057, 1059 (quoting *Zadvydas*, 533 U.S. at 701). If the noncitizen meets this burden, then ICE must "introduce evidence to refute that assertion." *Id.* (first citing *Zadvydas*, 533 U.S. at 701; and then citing *Xi v. I.N.S.*, 298 F.3d 832, 839–40 (9th Cir. 2002)); *see also Nadarajah v. Gonzales*, 443 F.3d 1069, 1082 (9th Cir. 2006) ("Given the unreasonable length of [petitioner's] detention, the unforeseeability of his removal, and the failure of the government to rebut his showing that there is no significant likelihood of removal in the reasonably foreseeable future, the government's continued detention violates federal law, as construed by the Supreme Court.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

*a)*    *Petitioner's Burden Under* Zadvydas

Here, Petitioner has met his burden to show that "there is no significant likelihood of removal in the reasonably foreseeable future." *Nadarajah*, 443 F.3d at 1082; *see also Zadvydas*, 533 U.S. at 701. First, Petitioner has already been detained for more than six months. He was first detained after his assault conviction from July 2000 through September 2001—more than a year. Dkt. 26-3 at 2; Dkt. 31 ¶ 3; Dkt. 26 ¶ 4. He was later detained from August 2003 to January 2004—an additional five months. Dkt. 26-4 at 2; Dkt. 26-7 at 5; Dkt. 31 ¶ 3; Dkt. 26 ¶¶ 5, 8. In total, Petitioner has been detained for around nineteen months (plus over a month since his detention on July 16, 2025). Petitioner's detention is not presumptively reasonable under *Zadvydas*. 533 U.S. at 701.

Respondents seem to concede this in their briefing, acknowledging that Petitioner has "moved beyond the presumptively reasonable time period many years prior to the revocation of his OSUP, but this does not make his present detention indefinite." Dkt. 37 at 10. But at oral argument, they seemed to claim that because his detention was not consecutive, the clock has restarted.

Other district courts have rejected similar arguments. In *Sied v. Nielsen*, the court explained that "the six-month period does not reset when the government detains a[] [noncitizen] . . ., releases him from detention, and then re-detains him again." No. 17-CV-06785-LB, 2018 WL 1876907, at *6 (N.D. Cal. Apr. 19, 2018) (citing cases). In *Chen v. Holder*, the court observed that "[s]urely, under the reasoning of *Zadvydas*, a series of releases and re-detentions by the government . . . while technically not in violation of the presumptively reasonable jurisprudential six month removal period, in essence results in an indefinite period of detention, albeit executed in successive six month intervals." No. CV 6:14-2530, 2015 WL 13236635, at *2

(W.D. La. Nov. 20, 2015). This Court agrees and concludes that Petitioner's detention is not presumptively reasonable. *Zadvydas*, 533 U.S. at 701.

Second, Petitioner has shown that his removal is not reasonably foreseeable. *Zadvydas* determined that detention becomes "indefinite" when there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Diouf v. Mukasey*, 542 F.3d 1222, 1233 (9th Cir. 2008) (quoting *Zadvydas*, 533 U.S. at 701). Respondents argue that, at most, Petitioner has shown a potential delay in the issuance of his travel document. Dkt. 37 at 11–12. They claim that a possible delay is insufficient to shift Petitioner's burden to the government. *Id.* at 11 (citing *Galtogbah v. Sessions*, 2019 WL 3766280, at *2 (W.D. La. June 18, 2019), *report and recommendation adopted*, 2019 WL 3761637 (W.D. La. Aug. 8, 2019)); *see also id.* at 12 (citing cases). This argument is unpersuasive.

To start, Petitioner has shown that ICE did not even request that Vietnam issue him a travel document until after he filed a habeas petition. ICE re-detained Petitioner on July 16, 2025. Dkt. 13-1 at 2. The written notice of revocation falsely stated that circumstances had changed because his case was "under current review by the Government of Vietnam for the issuance of a travel document." Dkt. 13-1. But it was only weeks later—the day of this Court's TRO hearing—that a deportation officer was assigned to Petitioner's case and asked him to finish the necessary paperwork. Dkt. 26 ¶ 10; Dkt. 27 ¶ 16.

Further, during that meeting, conversations with the ICE officer did not suggest that any changed circumstances in Petitioner's individual case made his deportation likely. The officer asked Petitioner whether he had family in Vietnam and whether he had a Vietnamese birth certificate. Dkt. 27 ¶ 18. Petitioner confirmed that he does not know of any family in Vietnam and could not provide an address where he would live there. *Id.* He does not know if Vietnam has a birth certificate for him. *Id.* According to Petitioner's declaration, after reviewing his file,

the officer responded, "Man, we don't have much information on you from Vietnam." *Id.* ¶ 19. The officer told Petitioner that he would have to submit the travel document request to Vietnam with the information in their possession. *Id.*

The Court does not know what factors the Vietnamese government considers in deciding to repatriate a pre-1995 immigrant. *See* Dkt. 26-6 at 4. This information has been redacted from the publicly available version of the 2020 MOU, and Respondents have not offered it. *See id.* But the questions that the ICE officer asked are on the self-declaration form attached to the MOU that an individual must complete to request travel documents. Dkt. 26-6 at 8–9. The form asks for a permanent address before leaving Vietnam, any relatives in Vietnam, any other relatives abroad, and with whom and where a repatriated Vietnamese citizen will live. *Id.* Petitioner has none of these things, and no connections that he knows of in Vietnam whatsoever. Dkt. 27 ¶¶ 18–20.

Moreover, Petitioner is not just an immigrant from Vietnam who happened to arrive in the United States before 1995; he is a refugee who fled Vietnam immediately after the fall of Saigon because his father had assisted the U.S. military in the Vietnam War. Dkt. 27 ¶ 2; Dkt. 30 ¶¶ 2–3. He came here as a five-year-old child, one of the first wave of Vietnamese refugees to be resettled in the United States after the war. *See id.* All of this provides "good reason to believe that there is no significant likelihood" Vietnam will accept Petitioner "in the reasonably foreseeable future," after it has refused to do so for more than twenty years. *Zadvydas*, 533 U.S. at 701.

More broadly, Petitioner has also offered evidence that the process for procuring travel documents from Vietnam for pre-1995 immigrants continues to be uncertain and protracted. First, Nguyen submitted a declaration filed by ICE agent Sellenia Romero in other litigation concerning re-detention of a Vietnamese citizen. Dkt. 26-11. Hoac, the petitioner in that case,

1    had entered the United States in 1987. *Id.* at 7. ICE started processing Hoac's travel document

2    request to Vietnam in September 2023. Dkt. 26-11 at 4. The document was not submitted until

3    November 2023. Dkt. 18-1 ¶ 14. Hoac was released under an order of supervision that

4    December. Dkt. 26-11 at 4. ICE submitted an updated travel request for Hoac in May 2025 and

5    re-detained Hoac in June. *Id.* As of July 16, 2025, when the district court ordered Hoac's release,

6    no travel documents had been issued. *See Hoac v. Becerra*, No. 2:25-CV-01740-DC-JDP, 2025

7    WL 1993771 (E.D. Cal. July 16, 2025).

8         Petitioner also submitted the declaration of Tin Thanh Nguyen, an experienced

9    immigration attorney in North Carolina whose practice largely consists of representing

10   Vietnamese nationals, including "liaising with the Government of Vietnam to facilitate the

11   issuance of travel documents." Dkt. 28 ¶¶ 3, 5, 7, 10. He explains that "[t]he process [for

12   requesting travel documents] is highly dependent on the individualized facts of each case,

13   including whether the individual has any family remaining in Vietnam, whether their Vietnamese

14   identity can be verified, their criminal records, and the manner in which they left Vietnam and

15   came to the United States, among many other factors." *Id.* ¶ 8. This testimony is consistent with

16   the information sought by Vietnam under the 2020 MOU and the questions asked of Petitioner

17   by his deportation officer, none of which suggest a significant likelihood that Vietnam will

18   accept him. Nguyen also noted that out of nearly a hundred cases on which he's worked this year

19   with a pre-1995 Vietnamese immigrant, he has "yet to see Vietnam issue a travel document

20   within 30 days or less." *Id.* ¶ 12. Rather, in his "experience, it can take many months to get any

21   answer from Vietnam about whether it will issue a travel document." *Id.* In contrast, Nguyen has

22   seen Vietnam issue travel documents within 30 days to individuals who arrived in the united

23   States after July 12, 1995. *Id.*

24

Thus, the Court finds that Petitioner has met his burden, offering sufficient evidence to show "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701.

### b) *Respondents' Burden Under* Zadvydas

The burden thus shifts to the government to "respond with evidence sufficient to rebut that showing." *Id.* During the Court's consideration of the TRO, Respondents argued that, with more time to prepare for a preliminary injunction hearing, they could rebut Petitioner's evidence. Dkt. 13 at 8–10. They asked the Court for "a reasonable opportunity to gather and produce that evidence before the Court makes a determination on [Petitioner's] request for release." *Id.* at 9. The Court did so, adopting the parties' proposed schedule. *See generally* Dkt. 21; Dkt. 22; Dkt. 23.

Respondents rely on several declarations. First, they offer two declarations from Jamie Burns, Acting Assistant Field Office Director at ERO in Tacoma, Washington. *Id.*; Dkt. 14; Dkt. 38 ¶ 1. The first declaration was submitted alongside Respondents' opposition to the TRO. Dkt. 14. The second was submitted alongside their opposition to the preliminary injunction motion. Dkt. 38.

In the first declaration, Burns states that on June 18, 2025, ERO Seattle contacted ERO Headquarters to inquire if there was a significant likelihood that Petitioner could be removed to Vietnam in the reasonably foreseeable future. Dkt. 14 ¶ 12. That same day, he explains, the Middle East and Eastern Africa Unit, which covers cases involving removals to Vietnam, advised of its position that there is currently a significant likelihood for removal in the reasonably foreseeable future as to *all* Vietnamese citizens, regardless of date of entry; that the Government of Vietnam has been issuing travel documents in less than 30 days; and that a charter flight for removals to Vietnam would be scheduled soon. *Id.* ¶ 13. He notes that, based on

his recent experience, Vietnam has issued travel documents to individuals who entered the United States before 1995. *Id.* ¶ 14.

Specific to Petitioner, Burns attested that "as stated in the OSUP revocation letter . . . Petitioner's OSUP was revoked because ICE has determined that Petitioner can be removed on the outstanding order of removal against him and his case is currently review by the Government of Vietnam for issuance of a travel document." *Id.* ¶ 16. Thus, Burns concluded, "ICE anticipates that a travel document will be issued and Petitioner will be removed to Vietnam shortly thereafter." *Id.* ¶ 17.

Most of the statements in Burns's first declaration are both vague and conclusory. At most, they establish that the government has increased repatriation rates for some Vietnamese citizens. And as explained in the findings of fact, the one representation specific to potential changed circumstances for Petitioner—that Vietnam was already reviewing Petitioner's case at the time he was detained—was later admitted not to be true, adversely affecting Burns's credibility. Dkt. 37 at 5. In his second declaration, Burns acknowledges that the travel document request for Petitioner was not forwarded to the ICE Attaché for Vietnam until August 7, 2025. Dkt. 38 ¶ 3.

Respondents also offer the declaration of Jessie Gonzalez, Detention and Deportation Officer for the Removal Management Division of the Eastern Hemisphere RIO unit. Dkt. 18-1 ¶ 3. Gonzalez states that the "Government of Vietnam has agreed to increase cooperation with the United States and issue travel documents in less than 30 days." *Id.* ¶ 6. He notes that in "Fiscal Year 2024 (FY24), ICE removed 58 final order Vietnamese citizens to Vietnam. As of July 25, 2025, ICE has removed 368 final order Vietnamese citizens to Vietnam in Fiscal Year 2025 (FY25)." *Id.* ¶ 7. Further, in "FY25, ICE has requested travel documents in 301 cases involving Vietnamese citizens. In 225 cases, ICE obtained the necessary travel documents from

the Government of Vietnam. Of those 225 cases, 154 entered the United States before July 12, 1995." *Id.* ¶ 8.

Finally, Respondents submitted a declaration from Brian Casey, the ERO Attaché in Hanoi, Vietnam. Dkt. 41-1. Casey stated that "[t]he Government of Vietnam has not formally denied any ICE request for a travel document since October 2, 2024." *Id.* at 2. And Casey explained, "[t]he Government of Vietnam has not taken more than 30 days to issue a travel document pursuant to any of our requests since mid-February 2025." *Id.* As explained in the findings of fact, this declaration does little more than restate the procedures set forth in the 2020 MOU—that when Vietnam accepts a citizen for repatriation, it is supposed to issue travel documents within 30 days, and that if a citizen does not meet Vietnam's eligibility criteria, there is a multi-step process for resolution rather than a formal denial.

These declarations are insufficient to meet Respondents' burden. At most, they establish that Vietnam is accepting more of its citizens for repatriation, including at least some citizens who arrived in the United States before 1995. At oral argument on both the TRO and the preliminary injunction motions, counsel for Respondents confirmed the government's position that this evidence of *some* increased deportations is enough to establish a significant likelihood that *any* Vietnamese citizen, including Petitioner, will be removed to Vietnam in the reasonably foreseeable future, justifying their detention.

This argument is unpersuasive. The Court agrees that these developments show there is at least some possibility that Vietnam will accept Petitioner at some point. But that is not the same as a significant likelihood that he will be accepted in the reasonably foreseeable future. *Zadvydas*, 555 U.S. at 701. Courts in this circuit have regularly refused to find Respondents' burden met where Respondents have offered little more than generalizations regarding the

likelihood that removal will occur. *See, e.g.*, *Singh v. Gonzales*, 448 F. Supp. 2d 1214, 1220

(W.D. Wash. 2006); *Chun Yat Ma*, 2012 WL 1432229, at *4–5; *Hoac*, 2025 WL 1993771, at *3.

For example, in *Singh v. Gonzales*, the court found that ICE had not met its burden where

it "merely assert[ed] that it has followed up on its request for travel documents" but could not

provide any "substantive indication regarding how or when it expect[ed] to obtain the necessary

travel document from the Indian government." 448 F. Supp. 2d at 1220. And in *Chun Yat Ma v.*

*Asher*, the court considered an affidavit from an ICE official that included a statement that an

individual's travel documents would "likely" be issued soon. 2012 WL 1432229, at *4. Yet, the

court noted, a deportation officer could not give any "indication of when the issuance may

occur." *Id.* As the court concluded, "[t]he conflicting statements concerning removal, together

with the Government's failure to provide a current affidavit or any sort of reliable evidence that

removal is likely weighs in favor of finding that Petitioner's removal is unlikely to happen in the

reasonably foreseeable future." *Id.*

More recently, in *Hoac v. Becerra*, the government made similar representations as it

does here. 2025 WL 1993771, at *3. The government asserted that "a change in circumstances

exist[ed] because there [was] a pending updated travel document request and a '2020 treaty

memorandum of understanding' that authorizes 'removal and repatriation of Vietnamese citizens

who arrived in the United States before July 1995. . . Additionally, Respondents assert[ed]

removal was reasonably foreseeable because removals to Vietnam have occurred recently.'" *Id.*

The court noted that the "fact that Respondents intend to complete a travel document request for

Petitioner does not make it significantly likely he will be removed in the foreseeable future." *Id.*

And the court explained, "[r]espondents have not provided any details about why a travel

document could not be obtained in the past, nor have they attempted to show why obtaining a

travel document is more likely this time around." *Id.*

The respondents in *Hoac* also pointed to the 2020 MOU. *Id.* But the Court noted that the MOU has repeatedly been deemed insufficient to show a significant likelihood of removable in the reasonably foreseeable future. *Id.* (citing *Liu v. Carter*, No. 25-3036-JWL, 2025 WL 1696526, at *2 (D. Kan. June 17, 2025)). And the court explained, "Respondents' contention that Petitioner's removal is reasonably foreseeable because removals to Vietnam are in fact occurring is unpersuasive." *Id.* at *5.

Respondents' strongest piece of evidence is the Gonzalez declaration. *See generally* Dkt. 18-1. Gonzalez attests that 58 Vietnamese citizens were removed in FY24 and 368 in FY25. *Id.* ¶ 7. Gonzalez did not note how many were pre-1995 arrivals. *See id.* Gonzalez also stated that, in FY25, ICE requested travel documents in 301 cases involving Vietnamese citizens and obtained travel documents in 225 cases. *Id.* ¶ 8. Of those 225 cases, 154 entered the United States pre-1995. *Id.* As Petitioner points out in reply, Gonzalez does not clarify whether travel documents *issued* in FY2025 were also *requested* in FY2025, or if they include requests made in previous fiscal years. Dkt. 40-1 at 11. But there is no dispute that this is a meaningful increase in the total number of removals compared to historical practice.

Ultimately, however, these numbers still fail to rebut the evidence presented by Petitioner that his individual circumstances make removal unlikely. The *Nguyen v. Hyde* court demanded an individualized analysis. No. 25-CV-11470-MJJ, 2025 WL 1725791, *4 (D. Mass. June 20, 2025). The court pointed out that it lacked "clear information as to whether or when Mr. Nguyen's request was submitted to Vietnam, whether Vietnam has even acknowledged receipt of the request or otherwise responded to Mr. Nguyen's request, or the anticipated wait time for a response from Vietnam." *Id.* Thus, the court found that respondents could not "make the showing that circumstances have changed such that there is a significant likelihood that Mr.

Nguyen [would] be removed to Vietnam in the reasonably foreseeable future pursuant to 8 C.F.R. § 241.13(i)(2)."

Again, the same is true here. The government has not provided any evidence of Vietnam's eligibility criteria or why it believes Petitioner now meets it. The government has not addressed Petitioner's evidence regarding his lack of family ties, a place to live, or identification documents from Vietnam; the circumstances of his entry into the United States following the Vietnam War; or his presence in this country since childhood, let alone provided any explanation for why these factors are no longer a barrier to his removal. The Court knows now that a request for travel documents was sent to Vietnam on August 7, 2025, but does not know if Vietnam has acknowledged or otherwise responded to the request. Dkt. 38 ¶ 3. And the Court does not know how long Petitioner may have to wait for travel documents—if Vietnam even decides to provide them. *See* Dkt. 41-1 at 2. Though Casey states that Vietnam has not "formally denied" any travel document request since October 2024 or "taken more than 30 days to issue a travel document," *see id.*, these statements fail to account for pending document requests that have sat unanswered for months. Dkt. 28 ¶¶ 12–14, 16–17.

Accordingly, the Court finds that Respondents have not met their burden to rebut Petitioner's evidence. Petitioner is likely to succeed on his claim that his re-detention remains indefinite and is prohibited by *Zadvydas*.

2.      *Re-Detention: ICE's Regulations and Statutory Requirements*

Petitioner also argues that ICE did not comply with its own regulations governing re-detention. Dkt. 25 at 20. Because the Court has already concluded that Petitioner is likely to succeed on the merits of his *Zadvydas* claim, and that this entitles him to release pending the outcome of this litigation, the Court declines to address this claim at the preliminary injunction stage.

3.      *Third-Country Removal: Due Process*

Petitioner has also shown a likelihood of success on his claim that he cannot be removed to a third country without sufficient notice and opportunity to be heard, and that ICE's current third-country removal policy violates due process. *Id.* at 24–25. As another court in this district has previously held, a "noncitizen must be given sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation." *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1009 (W.D. Wash. 2019) (first citing *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976); and then citing *Kossov v. I.N.S.*, 132 F.3d 405, 408 (7th Cir. 1998)). "The guarantee of due process includes the right to a full and fair hearing, an impartial decisionmaker, and evaluation of the merits of his or her particular claim." *Aden*, 409 F. Supp. 3d at 1010 (citing *Torres-Aguilar v. INS*, 246 F.3d 1267, 1270 (9th Cir. 2001)). "[B]oth the due process clause and the governing statute place the burden on the government—regardless of whether the country of deportation is designated during or after the removal hearing—to provide a meaningful opportunity to be heard on asylum and withholding claims." *Id.* This cannot be satisfied by simply allowing the noncitizen to file a motion to reopen their removal proceedings; rather, the removal proceedings must be reopened so that a hearing can be held. *Id.* at 1011.

The requirements set forth in *Aden* flow directly from binding Ninth Circuit precedent about due process protections before removal to a third country. "Failing to notify individuals who are subject to deportation that they have the right to apply . . . for withholding of deportation to the country to which they will be deported violates both INS regulations and the constitutional right to due process." *Andriasian*, v. *I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999)) (citing *Kossov*, 132 F.3d at 408–09); *see also Sadychov v. Holder*, 565 F. App'x 648, 651 (9th Cir. 2014) ("[S]hould circumstances change such that Azerbaijan is the designated country of removal, the

agency must provide Sadychov with notice and an opportunity to reopen his case for full adjudication of his claim of withholding of removal from Azerbaijan."). "In the context of country of removal designations, last minute orders of removal to a country may violate due process if an immigrant was not provided an opportunity to address his fear of persecution in that country." *Najjar v. Lynch*, 630 Fed. App'x 724 (9th Cir. 2016) (citing *Andriasian*, 180 F.3d at 1041); *El Himri v. Ashcroft,* 378 F.3d 932, 938 (9th Cir. 2004).

That Ninth Circuit precedent is binding on this Court, and the application of that precedent in *Aden* is persuasive. At the TRO stage of this case, Respondents represented to the Court that they would continue to follow the procedures required by *Aden*. Dkt. 13 at 7 n.3. But by the time of the preliminary injunction hearing, Respondents withdrew that commitment, and acknowledged that the ICE memo dated July 9, 2025 "sets forth Respondents' current policy on third country removals both nationwide and in the Western District of Washington where Respondents are no longer fully following the process discussed" in *Aden*. Dkt. 37 at 16 n.7.

The July 9, 2025 ICE memo provides:

If the United States has received diplomatic assurances from the country of removal that [noncitizens] removed from the United States will not be persecuted or tortured, and if the Department of State believes those assurances to be credible, the [noncitizen] may be removed without the need for further procedures. ICE will seek written confirmation from the Department of State that such diplomatic assurances were received and determined to be credible. HSI and ERO will be made aware of any such assurances. In all other cases, ICE must comply with the following procedures:

- An ERO officer will serve on the [noncitizen] the attached Notice of Removal. The notice includes the intended country of removal and will be read to the [noncitizen] in a language he or she understands.
- ERO will not affirmatively ask whether the [noncitizen] is afraid of being removed to the country of removal.
- ERO will generally wait at least 24 hours following service of the Notice of Removal before effectuating removal. In exigent circumstances, ERO may execute a removal order six (6) or more hours after service of the Notice of Removal as long as the [noncitizen] is provided reasonable means and opportunity to speak with an attorney prior to removal.

- Any determination to execute a removal order under exigent circumstances less than 24 hours following service of the Notice of Removal must be approved by the DHS General Counsel, or the Principal Legal Advisor where the DHS General Counsel is not available.
- If the [noncitizen] <u>does not</u> affirmatively state a fear of persecution or torture if removed to the country of removal listed on the Notice of Removal within 24 hours, ERO may proceed with removal to the country identified on the notice. ERO should check all systems for motions as close in time as possible to removal.
- If the [noncitizen] <u>does affirmatively state</u> a fear if removed to the country of removal listed on the Notice of Removal, ERO will refer the case to U.S. Citizenship and Immigration Services (USCIS) for a screening for eligibility for protection under section 241(b)(3) of the INA and the Convention Against Torture (CAT). USCIS will generally screen the [noncitizen] within 24 hours of referral.

Dkt. 2-3 at 2–3.

This policy contravenes Ninth Circuit law, as laid out above. *See Andriasian,* 180 F.3d at 1041; *Himri*, 378 F.3d at 938–39; *Aden,* 409 F. Supp. 3d at 1004. It would be impossible to comply both with Ninth Circuit precedent and the policy. *See Andriasian,* 180 F.3d at 1041; *Aden,* 409 F. Supp. 3d at 1009; Dkt. 2-3 at 2–3. Indeed, Respondents chose not to contest the merits of this claim at all in their opposition to the motion for preliminary injunction. *See* Dkt. 37 at 17–19. They relied solely on their argument that the class litigation in *D.V.D.* and the Supreme Court's stay of a classwide injunction in that case prevent this Court from providing relief. *Id.*

This Court, however, must follow Ninth Circuit precedent. Under that precedent, Petitioner is likely to succeed on his claim that removal to a third country under ICE's current policy, without meaningful notice and reopening of his removal proceedings for a hearing, would violate due process.

a)      *Petitioner's Ability to Seek Relief*

Rather than address the merits, Respondents argue that Petitioner "is not entitled to the relief he seeks" because he is a member of the non-opt out *D.V.D.* certified class. Dkt. 37 at 17. They claim that "[b]ecause Petitioner is bound as a member of the non-opt out class of

individuals governed by the *D.V.D.* nationwide preliminary injunction, which the Supreme Court has now stayed finding that the government is likely to prevail on the merits of its appeal, this Court should dismiss the action." *Id.*

To support their claim, Respondents point to *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013). *Id.* at 19. There, the defendants moved to dismiss under Rule 12(b)(6) "solely on the ground" that the injunctive relief requested could not "be brought independently of the [related] class-action." *Pride*, 719 F.3d at 1133. The district court agreed and dismissed the case. *Id.* On review, the Ninth Circuit generally agreed, explaining that a "district court may dismiss 'those portions of [the] complaint which duplicate the [class action's] allegations and prayer for relief.'" *Id.* (quoting *Crawford v. Bell*, 599 F.2d 890, 893 (9th Cir. 1979)). But, the Ninth Circuit noted, "a district court may not 'dismiss[ ] those allegations of [the] complaint which go beyond the allegations and relief prayed for in [the class action].'" *Id.* (citations omitted). The court, by way of example, pointed to its decision in *Krug v. Lutz*, 329 F.3d 692 (9th Cir. 2003). *Id.* at 1134. In *Krug*, they considered when "class action consent decrees concerning prison conditions bar an individual claim for relief." *Id.* (citing *Krug*, 329 F.3d at 696). There, "consent decrees had been entered regarding a broad category" of conduct at the prisons. *Id.* (citing *Krug*, 329 F.3d at 696). The Ninth Circuit "held that an individual defendant is permitted to litigate an 'independent constitutional action' where the 'specific issues' raised '[have] not already been addressed conclusively by the decrees.'" *Id.* (citing *Krug*, 329 F.3d at 696).

Following this rule, the court in *Pride* found that a provision in the class litigation requiring inmates to "utilize an inmate grievance procedure" if denied medical care did not preclude claims concerning "specific medical treatment denied to individual inmates." *Id.* at 1136. The court concluded that the class sought "systemic reform of medical care in the California prisons for inmates with serious medical needs," but that the plaintiff's "[i]ndividual

claims for injunctive relief related to medical treatment [were] discrete from the claims for systemic reform addressed" by the class. *Id.* at 1136–37; *see also id.* at 1137 ("Thus, we conclude that where a California prisoner brings an independent claim for injunctive relief solely on his own behalf for specific medical treatment denied to him, *Plata* does not bar the prisoner's claim for injunctive relief.") (citing cases).

Further, the court noted that "[t]o preclude an inmate from proceeding on a claim for injunctive relief for his individual medical care would lead to unwarranted delay." *Id.* at 1137. The court explained that "[a]n inmate who successfully proved that prison officials were deliberately indifferent to his serious medical needs would be powerless to petition the courts for redress of the violation until [the class action], which has been pending now for twelve years, has been fully resolved." *Id.*

Petitioner seeks an injunction preventing Respondents from removing him to a third country without due process. Dkt. 25 at 8; *see Pride*, 719 F.3d at 1137. His due process claim is not identical to the claims at issue in the *D.V.D.* class action—Petitioner argues that due process requires he have a meaningful opportunity to seek withholding of removal, a claim not at issue in *D.V.D.* (which concerns claims under the Convention Against Torture). Dkt 25 at 26–27; Resp'ts' Application for Stay 11 n.2, *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153 (2025).

Nor does Petitioner's habeas petition raise a "complaint to systemic relief for [detainees fearing third-country removal] generally." *See generally* Dkt. 1; *Pride*, 719 F.3d at 1137. Like the plaintiffs in *Pride* and *Krug*, Petitioner "may bring his independent claim for injunctive relief because it is not duplicative of the [*D.V.D.*] litigation[.]" *Pride*, 719 F.3d at 1137–38. And like the *Pride* plaintiffs, without that opportunity, Petitioner would be left "powerless to petition the courts for redress" until the *D.V.D.* class action has been "fully resolved." *Id.* at 1137.

The Court also notes that Respondents' position contradicts the position they have taken in *D.V.D.* itself. As explained further below, one of the government's primary arguments against the injunction in *D.V.D.* is that there is a jurisdictional bar to classwide injunctive relief in that case. Resp'ts' Application for Stay 5–6, 21–27, *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153 (2025). In other words, the government is arguing in *D.V.D.* that injunctive relief cannot be granted to the class, and may only be pursued (if at all) through individual cases, while arguing here that Petitioner's individual claim should be barred because his injunctive claims should be adjudicated as part of the *D.V.D.* class. The contradiction in these arguments further undermines Respondents' position here. The class certification order in *D.V.D.* does not prevent this Court from adjudicating Petitioner's claims regarding third-country removal.

> b)    Impact of D.V.D. *on Petitioner's Claims*

Respondents also argue that the Court should refuse to consider Petitioner's third country removal claims because of the Supreme Court's stay of a classwide injunction in *D.V.D.* Dkt. 37 at 17. They claim that "[t]he Supreme Court has already found that Respondents are likely to succeed on the legal arguments presented in response to the instant habeas petition." *Id.* at 18. And, without any discussion of binding Ninth Circuit precedent, they argue that "this Court should avoid providing Petitioner with relief that is likely to be rejected and overturned by the Supreme Court." *Id.* But this Court cannot ignore binding authority in favor of speculation about the intent of an interlocutory emergency docket order issued without any reasoning.

*D.V.D.* was initially filed in district court in Massachusetts. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355 (D. Mass. 2025), *opinion clarified*, No. CV 25-10676-BEM, 2025 WL 1323697 (D. Mass. May 7, 2025), *and opinion clarified*, No. CV 25-10676-BEM, 2025 WL 1453640 (D. Mass. May 21, 2025), *reconsideration denied sub nom. D.V.D v. U.S. Dep't of Homeland Sec.*, No. CV 25-10676-BEM, 2025 WL 1495517 (D. Mass. May 26,

2025). Five noncitizens with final removal orders moved for class certification and for declaratory and injunctive relief against the government. *Id.* at 369–70. They claimed that the government's plan to remove noncitizens to a third country without first providing notice and an opportunity to assert fear of persecution or torture violated their due process rights. *Id.* at 368–69. The district court certified the class and granted the motion for a preliminary classwide injunction. *Id.* at 394.

After the First Circuit declined to stay the injunction, the government filed an application to stay the preliminary injunction with the Supreme Court. Resp'ts' Application for Stay, *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153 (2025). In its application, the government claimed that the district court "disregarded three separate sets of jurisdictional bars that Congress adopted to preserve the primacy of the Executive Branch in carrying out the core sovereign function of removing [noncitizens] from this country." *Id.* at 4. The government pointed to various provisions of the INA which "entrust[] the Executive Branch with executing removal orders, and ensuring that [noncitizens] who have been ordered removed are in fact removed from the United States." *Id.* Thus, the government contended, the injunction ran "afoul of multiple independent jurisdictional bars" which include: 1) an INA prohibition on lower federal courts issuing classwide relief that restricts the statute's provisions; 2) a provision that "specifically strip[s] district courts of jurisdiction to review claims challenging the government's implementation of CAT"; and 3) a provision that "generally strip[s] [district courts] of jurisdiction to adjudicate freestanding suits arising from actions taken to execute removals[.]" *Id.* at 5–6.

Finally, the government argued that the district court had erred in its consideration of the plaintiffs' likelihood of success on the merits. *Id.* at 7. The district court found that individualized assessments were required before removal. *Id.* And the district court "crafted new

timelines, ordering that [noncitizens] must be given at least 10 days to raise a CAT-based fear [claim], and another 15 to contest any adverse finding as to that claim." *Id.*

The Supreme Court granted the application and stayed the injunction pending the government's appeal to the First Circuit without any explanation of its reasoning. *D.V.D.*, 145 S. Ct. at 2153. The Supreme Court did not decide *D.V.D.* on the merits, nor did it even necessarily rule on the class's likelihood of success on its due process and APA claims. *See, e.g.*, *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("The stay will allow this Court to decide the merits in an orderly fashion—after full briefing, oral argument, and our usual extensive internal deliberations—and ensure that we do *not* have to decide the merits on the emergency docket. To reiterate: The Court's stay order is not a decision on the merits.") (emphasis in original).

Analyzing a case like *D.V.D.* presents several challenges. To obtain a stay on the emergency docket, "an applicant must show (1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010). In "close cases" the Court "will balance the equities and weigh the relative harms to the applicant and to the respondent." *Id.*; *see also Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, J., concurring). This test requires the Court to consider the merits of the claims to an extent. *See, e.g.*, *Little*, 140 S. Ct. at 2617; *see also D.V.D.*, 145 S. Ct. at 2158 (Sotomayor, J., dissenting) ("Ordinarily, the Court considers the likelihood of irreparable harm to the applicant absent emergency intervention, the applicant's likelihood of success on the merits of an appeal to this Court, and the equities.").

But sometimes, as is the case here, it is unclear why the Court determined a stay should be granted or which argument it found likely to prevail on appeal. As Judge Trevor McFadden of the D.C. Circuit has written, "[w]hen a majority of the Supreme Court has expressed its view on a stay applicant's likelihood of success on the merits, lower courts seeking to determine the stay's precedential effect should examine the underlying merits dispute." Trevor N. McFadden & Vetan Kapoor, *The Precedential Effects of the Supreme Court's Emergency Stays*, 44 HARV. J.L. & PUB. POL'Y 827, 857 (2021). And "[i]f the stay grant makes it clear that the movant's position on a legal question is likely correct, lower courts can—and  should—treat the Court's decision as precedential." *Id.*

In some cases, the Court has done just that. *See id.* For example, in *Trump v. Sierra Club*, the Court offered some explanation: "[a]mong the reasons is that the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." 140 S. Ct. 1 (2019). Or in *Trump v. International Refugee Assistance Project* (*IRAP*), the Court found the injunction too broad, and directed the lower court to "mold its decree to meet the exigencies of the particular case." 137 S. Ct. 2080 (2017) (per curiam). Thus, as Judge McFadden explains, "[t]he more detail and clarity the Supreme Court provides about why it is granting a stay, the more confident a lower court can be in treating the Court's opinion as precedential." McFadden & Kapoor at 864.

But here, the Court has offered no such reasoning. *See D.V.D.*, 145 S. Ct. at 2153. As the dissent in *D.V.D.* notes, "[o]n the merits of its appeal, the [g]overnment principally raises a bevy of jurisdictional objections." *Id.* at 2160. This Court cannot ascertain from the Supreme Court's emergency order whether it found the government likely to succeed on its jurisdictional or substantive claims. This distinction is especially important in this case, where one of the

government's primary arguments—that the *D.V.D.* court had no power to enter *classwide* injunctive relief—would have no bearing on the merits of individual habeas petitions.

And absent "clear guidance from the Supreme Court" that cases like *Andriasian*, *Himri*, and *Aden* are "no longer good law," this Court must follow "well-established precedent." *Launch Alaska v. Dep't of the Navy, Off. of Naval Rsch.*, No. 3:25-CV-00141-GMS, 2025 WL 2223744, at *4 (D. Alaska Aug. 5, 2025); *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment"). The emergency docket order in *D.V.D.* does not preclude the Court from granting a preliminary injunction here.

### 4. Third-Country Removal: Punitive Nature of Removal

Finally, Petitioner has shown a likelihood of success on his claim that ICE's practice of removing noncitizens to countries where they face imprisonment violates the Constitution's prohibition on "punitive" third country removal.

Petitioner relies on *Wong Wing v. United States*, 163 U.S. 228 (1896), one of several seminal Supreme Court decisions arising from the Chinese Exclusion Act. Dkt. 25 at 27. In *Wong Wing*, the Court invalidated a portion of the act which provided that "any such Chinese person, or person of Chinese descent, convicted and adjudged to be not lawfully entitled to be or remain in the United States, *shall be imprisoned at hard labor for a period not exceeding one year*, and thereafter removed from the United States." *Wong Wing*, 163 U.S. at 233–34 (emphasis added). The Court held that while "it is within the constitutional power of congress" to deport those unlawfully present in the United States, Congress could not add to the sanction of expulsion the "punishment by imprisonment at hard labor . . . without a trial by jury." *Id.* at 235. The Court explained that there is a fundamental difference between "detention or temporary

confinement" while awaiting deportation and "imprisonment at hard labor." *Id.* at 236. The latter, the Court concluded, was an "infamous punishment" that could only be imposed following a criminal trial with the full protection of the Fifth and Sixth Amendments. *Id.* at 237–38.

More than a hundred years later, the Court affirmed this holding in *Zadvydas*, noting that it had previously "held that the Due Process Clause protects an [noncitizen] subject to a final order of deportation, . . . though the nature of that protection may vary depending upon status and circumstance[.]" 533 U.S. at 693–94 (citation modified). *Zadvydas* further clarified *Wong Wing* had "held that punitive measures could not be imposed upon [noncitizens] ordered removed because 'all persons within the territory of the United States are entitled to the protection' of the Constitution." *Id.* at 694 (quoting *Wong Wing*, 163 U.S. at 238). The Court described this as a "substantive protection[] for aliens who had been ordered removed." *Id.* at 694. In the wake of these cases, the Ninth Circuit has similarly "recognized [] limits on detention of noncitizens pending removal," specifically noting that "[s]uch detention may not be punitive[.]" *Rodriguez v. Robbins*, 804 F.3d 1060, 1076 (9th Cir. 2015), *rev'd sub nom. on other grounds Jennings v. Rodriguez*, 583 U.S. 281 (2018) (citation omitted).

Here, to show that the Trump Administration's current third-country removal practices are unconstitutionally punitive, Petitioner primarily relies on statements made by government officials, both on social media and to the press, acknowledging that deportees to third countries are being imprisoned and expressing intent to continue that practice. A court may take judicial notice of facts "not subject to reasonable dispute" because they are either: "(1) [] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. This includes "information [that] was made publicly available by government entities" where

"neither party disputes the authenticity . . . or the accuracy of the information." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).

While the articles in full are likely not judicially noticeable, public statements made by government officials (to the press or on social media) can be noticed. *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 520 n.4, n.6, n.7 (N.D. Cal. 2017) (taking judicial notice of press conference and interview statements); *Cnty. of Santa Clara v. Trump*, 267 F. Supp. 3d 1201, 1217 (N.D. Cal. 2017) (taking judicial notice of op-ed). And these statements, as explained by Petitioner, do offer evidence that third country deportation is occurring as a punishment. *See, e.g.*, Dkt. 25 at 13 (official video of President Donald J. Trump stating "[I]f illegal aliens choose to remain in America, they're remaining illegally and they will face severe consequences. Illegal aliens who stay in America face punishments, including significant jail time, enormous financial penalties, confiscation of all property, garnishment of all wages, imprisonment and incarceration, and sudden deportation in a place and manner solely of our discretion."); *see also id.* (statement by President Donald J. Trump that immigrants would be detained at Guantanamo Bay prison because "it's a tough place to get out" and "we don't want them coming back."). Petitioner has also offered sworn declarations that the pre-1995 Vietnamese immigrants who have been deported to South Sudan and Eswatini have been imprisoned incommunicado since their arrival. *See* Dkt. 29 ¶ 18; Dkt. 28 ¶ 19.

Other courts across the country have recognized that the government is intentionally removing individuals to countries where they will be imprisoned. *See, e.g.*, *Artiga-Morales v. Bondi*, No. 24-2519, 2025 WL 2305405, at *1 (9th Cir. Aug. 11, 2025) ("The evidence also establishes that there have been instances of torture in Salvadoran prisons [.]"); *see also id.* at *3 (Desai, J. dissenting) ("[C]onditions at this new mega-prison, the Terrorism Confinement Center (CECOT), appear just as bad if not worse than the other prisons. At CECOT, each prison cell

will hold 100 detainees with access to only two toilets; a detainee only has an average of 0.6 square meters of individual space, which is far below the international standards for humane treatment in detention facilities. The government has also constructed 'punishment' cells, which are sensory deprivation chambers where detainees are confined in complete darkness. . . . Further, there is no doubt that the Salvadorean government created these horrific prison conditions for the specific purpose of inflicting suffering.") (citation omitted); *Rivera-Trigueros v. Bondi*, No. 24-3764, 2025 WL 1189561, at *2 (9th Cir. Apr. 24, 2025) (finding individual had shown that, if detained in El Salvador, he would "confront a prison environment in which torture is pervasive" and that "the squalid conditions in Salvadoran prisons—which include extreme overcrowding, inadequate sanitation, and a lack of food—are deliberately inflicted by government officials as a form of punishment.") (citation omitted); *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501, 509 (D. Md. 2025) ("ICE forcibly transported Abrego Garcia to the Terrorism Confinement Center ('CECOT') in El Salvador, a notorious supermax prison known for widespread human rights violations."); *Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *1 (4th Cir. Apr. 7, 2025) (denying stay pending appeal and citing district court order in doing so); *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *30 (D.C. Cir. Mar. 26, 2025) (Millett, J. concurring) ("And the removals under the [Alien Enemies Act] thus far have been not to their home countries, but directly into a Salvadorean jail reported to have a notorious reputation for human rights abuses and disappearances.").

Respondents do not dispute that government officials made these statements. *See* Dkt. 37. Nor do Respondents dispute that deportees to El Salvador, South Sudan, and Eswatini have been imprisoned upon their arrival. *See id.* Respondents again do not address the merits of this claim at all. *See id.*

ORDER GRANTING PRELIMINARY INJUNCTION - 46

Respondents' only arguments opposing Petitioner's punitive third-country removal claim are the same as those for his APA and due process claims: that relief is foreclosed by the *D.V.D.* litigation. *See* Dkt. 37 at 8, 16–20. But the punitive removal claim was not considered by the district court or Supreme Court in *D.V.D.* at all. *See D.V.D.*, 145 S. Ct. 2153. In fact, none of the briefing even cites *Wong Wing*. *See* Resp'ts' Application for Stay; Pet'r's Resp., *Dep't of Homeland Sec. v. D.V.D.* 145 S. Ct. 2153 (2025); Resp'ts' Reply, *Dep't of Homeland Sec. v. D.V.D.* 145 S. Ct. 2153 (2025). These arguments are not at all persuasive. Petitioner has shown a likelihood of success on the merits that Respondents' practice of third-country removal paired with imprisonment violates due process.

## C.    Irreparable Harm

The irreparable harm standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). The Supreme Court in *Winter* cautioned that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). The Ninth Circuit has long held that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quoting *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)). "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Id.* (quoting *Winter*, 555 U.S. at 22).

1      *1.    Re-Detention*

2         Petitioner has demonstrated that he will suffer irreparable harm from his re-detention.

3  The Ninth Circuit has recognized "the irreparable harms imposed on anyone subject to

4  immigration detention." *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1253 (W.D. Wash. 2025)

5  (citing *Hernandez*, 872 F.3d at 995) ("For example . . . subpar medical and psychiatric care in

6  ICE detention facilities, the economic burdens imposed on detainees and their families as a result

7  of detention, and the collateral harms to children of detainees whose parents are detained."). "In

8  the absence of an injunction, harms such as these will continue to occur needlessly on a daily

9  basis." *Hernandez*, 872 F.3d at 995.

10        Petitioner has shown that his family has already suffered as a result of his detention.

11 Before his re-detention, Petitioner lived with his elderly parents. Dkt. 27 ¶ 4; Dkt. 30 ¶ 5. He

12 supports them with "medical appointments, medication management, cooking, cleaning, and

13 transportation." Dkt. 30 ¶ 5. Petitioner's father has attested that Petitioner helps his parents

14 "continue to live with dignity and independence." *Id.* Without Petitioner, his parents "would face

15 severe hardship and possibly be forced into assisted living, which we hope to avoid." *Id.* Finally,

16 Petitioner's father he notes that "[w]e already miss his presence at home since he has been

17 detained and are struggling to adjust without his help around the house and with our daily

18 routines." *Id.*

19        Similarly, Petitioner co-parents his daughter with her mother, Anita Amantea. Ms.

20 Amantea also submitted a declaration to the Court. Dkt. 32. She explains that their daughter

21 suffers from Prader-Willi Syndrome, a rare genetic disorder that "requires constant, round-the-

22 clock supervision and highly structured caregiving." *Id.* ¶¶ 2, 5. She "cannot be left alone due to

23 her poor decision-making skills, impulse control issues, hyperphagia, cognitive limitations, and

24 risk of emotional and behavioral dysregulation." *Id.* ¶ 5. And she "is highly dependent on daily

structure and predictability. Her safety and stability rely heavily on familiarity, consistency, and emotional connection—especially from those she has bonded with throughout her life." *Id.* Ms. Amantea relies on Petitioner's support to manage her care. *Id.* ¶ 8.

Ms. Amantea explains that Petitioner plays a critical role in daughter's "daily stability and overall health." *Id.* His re-detention, and ultimately his removal, "would be emotionally devastating to her and would likely result in severe behavioral regression, emotional shutdowns, panic, and possibly even medical emergencies." *Id.* ¶ 7.

These are exactly the kinds of detention-related harms the Ninth Circuit recognized in *Hernandez v. Sessions*, 872 F.3d at 995 ("the collateral harms to children of detainees whose parents are detained"). Accordingly, the Court finds that Petitioner has sufficiently demonstrated that he has suffered—and will suffer—irreparable harm until he is released from detention. *See id.* ("In the absence of an injunction, harms such as these will continue to occur needlessly on a daily basis.").

### 2.    *Third-Country Removal*

Petitioner has also shown that he will suffer irreparable harm in the absence of an injunction barring his removal to a third country. It is beyond dispute that Petitioner would face irreparable harm from removal to a third country. *A.A.R.P. v. Trump*, 145 S. Ct. at 1364, 1367 (2025) (detainees with pending habeas petitions facing removal under Alien Enemies Act faced "an imminent threat of severe, irreparable harm"). And Petitioner has demonstrated that his removal to a third country is an "immediate threatened injury[.]" *Caribbean Marine Servs.,* 844 F.2d at 674.

Petitioner offers ICE's own policy as evidence that his removal to a third country is an imminent threat. Dkt. 26-1 at 2–3. The policy explains that "[i]f the United States has received diplomatic assurances from the country of removal that [noncitizens] removed from the United

States will not be persecuted or tortured, and if the Department of State believes those assurances to be credible, the [noncitizen] may be removed without the need for further procedures." *Id.* at 2. In those cases where ICE has not received diplomatic assurances, an officer will serve the noncitizen with a notice of removal, including the intended country of removal. *Id.* The policy notes that ICE will "will <u>not</u> affirmatively ask whether the [noncitizen] is afraid of being removed to the country of removal." *Id.* (emphasis in original). And ICE will "generally wait at least 24 hours following service of the Notice of Removal before effectuating removal." *Id.* But in "exigent circumstances," ICE need wait only six hours. *Id.* If the noncitizen "does not affirmatively state a fear of persecution or torture if removed to the country on the notice within 24 hours," they will be removed. *Id.* at 3.

This policy alone could make Petitioner's removal to a third country an imminent threat given the low likelihood of his removal to Vietnam. But Petitioner has also offered testimony from counsel for other similarly situated individuals who have been removed to third countries with little notice. Glenda M. Aldana Madrid, counsel for another pre-1995 Vietnamese arrival, Tuan Thanh Phan, submitted a declaration. Dkt. 29 ¶ 4. She explained that Phan was in ICE custody from March 3, 2025 through May 20, 2025. *Id.* ¶ 6. On May 20, 2025, he was put on a deportation flight to South Sudan. *Id.* His wife had been in communication with a deportation officer who was in charge of her husband's case. *Id.* ¶ 7. She was trying to help "facilitate his deportation to Vietnam, the country on his order of removal." *Id.* They even provided the deportation officer with contact information for a family member in Vietnam who would meet him when he arrived there. *Id.* ¶ 8. Phan's wife was coordinating with the officer to bring Phan luggage before he was removed to Vietnam. *Id.* ¶ 9; *see also* Dkt. 29-1 at 2–4. On May 19, she reached out to the deportation officer about sending the luggage but learned that the officer had not yet submitted the paperwork for Phan's travel documents. Dkt. 29 ¶ 10. The ICE officer told

her that he "received one email stating immediate transfer" and that "[n]one of [his] supervisors even know what is going on with him." Dkt. 29-1 at 4–5. After some delay related to the *D.V.D.* litigation, Phan was ultimately sent to South Sudan, where he has been "held incommunicado in government custody." Dkt. 29 ¶¶ 13–18.

Counsel in another case submitted a declaration that one of their clients, also a pre-1995 Vietnamese national, was deported to Eswatini without ICE ever seeking removal to Vietnam. Dkt. 28 ¶ 19. Like Phan, this client had family members in Vietnam, though they never heard from the Government of Vietnam about his possible return. *Id.* The client also "never mentioned anything about ICE obtaining a travel document to his wife who was in frequent communication with him during the period of his immigration custody." *Id.* And it is unknown if the client was ever given notice of his deportation to Eswatini before it occurred. *Id.* In fact, his wife only learned of his deportation to Eswatini because of a post on social media from a government official. *Id.*

Coupled with ICE's own policy, this is sufficient evidence to demonstrate that, without an injunction, Petitioner faces a likelihood of removal to a third country with no meaningful opportunity to challenge that decision.

Yet at argument, counsel for Respondents argued that Petitioner cannot show irreparable harm because they have voluntarily promised not to remove him to a third country unless Vietnam denies their request for travel documents. In Burns's second declaration, he states that "ICE is currently seeking to remove Petitioner solely to Vietnam and will not attempt a third country removal unless and until Vietnam denies the pending travel document request." Dkt. 38 ¶ 4. And he notes that "ICE agrees to provide Petitioner's counsel 24 hours advance notice if the agency decides to pursue a third country removal." *Id.* ¶ 5.

The Court appreciates Burns's efforts to offer a proposal that would avoid the need for an injunction. But the Ninth Circuit has found such voluntary promises insufficient. *Boardman*, 822 F.3d at 1023. In *Boardman v. Pacific Seafood Group*, the plaintiffs argued that the defendant's acquisition of another seafood company would create "a monopsony in multiple seafood input markets on the West Coast." *Id.* at 1022–23. Defendants argued that there was no *immediate* danger of irreparable harm because they had terminated the proposed acquisition and stipulated that they would not enter a purchase transaction with the other company's entities while the Oregon Attorney General's investigation was pending. *Id*. at 1023. Defendants, however, could terminate the stipulation with 60-days notice to the Oregon Attorney General and the district court. *Id*.

Quoting *Winter*, the *Boardman* court noted that a "threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Id*. (quoting *Winter,* 555 U.S. at 22). The court then rejected the defendants' argument that their reassurances were sufficient to mitigate the immediate threatened injury the plaintiffs faced:

> Given: (1) the limited nature of Defendants' proposed stipulation (not to enter a "purchase transaction," when a deal with Ocean Gold could take on many different structures); (2) the expiration of Pacific Seafood and Ocean Gold's exclusive marketing agreement in February 2016; (3) Defendants' history of negotiating an acquisition for many months in secret before notifying Plaintiffs; and (4) the fact that Defendants may terminate their stipulation with 60-days' notice, Plaintiffs have established a sufficient likelihood that, in the absence of preliminary injunctive relief, they would suffer irreparable harm before a trial on the merits could be held.

*Id.* at 1023. Thus, the Ninth Circuit concluded, "the district court did not abuse its discretion in ruling that Plaintiffs sufficiently demonstrated a threat of irreparable harm." *Id.*

Since *Boardman*, district courts have reached similar conclusions. In *Pinocci v. Flynn*, 729 F. Supp. 3d 1060, 1067 (D. Mont. 2024), the plaintiffs challenged a law limiting their ability

to post political signs near highways and interstates. They asserted that they had experienced irreparable harm by nature of their chilled political speech. At the hearing, counsel for the defendant noted that the defendant "immediately and voluntarily suspended enforcement of the durational limits included in the administrative rule" and therefore, the defendants had "made it extremely clear to [the plaintiffs] that they can continue to display their signs without fear of enforcement of the durational limits." *Id.* Counsel for the defendants further contested the necessity of a preliminary injunction because a revised rule—expected to take effect May 11, 2024—eliminated the durational restrictions on political signage. *Id.* Nonetheless, the court concluded that "[t]hough a preliminary injunction may be of little functionality as long as Flynn is holding up his end of the promise, Plaintiffs still presented a prohibition on protected First Amendment political speech that constitutes irreparable harm." *Id.* at 1067–68.

Similarly, in *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1150–51 (D. Or. 2020), the plaintiffs sued DHS and the USMS arguing that they had been repeatedly targeted for violence as journalists, in violation of their First and Fourth Amendment rights. The court relied heavily on *Boardman*, explaining that the defendants' "argument that the voluntary change in tactics has decreased the immediacy of any claim of injury, thereby mitigating irreparable harm," had been "rejected." *Id.* at 1150. The court concluded that the plaintiffs' "irreparable injury" was "not nearly as attenuated as *Boardman* and indeed [was] much more immediate because it could happen without any prior notice to the Court." *Id.* The Court had found that the plaintiffs faced irreparable harm from the defendants' conduct despite the defendants' promises. *Id.* at 1154.

Here, the Court is guided by these cases in finding that Burns's declaration is insufficient to rebut Petitioner's showing of irreparable harm. Burns has attested that ICE will give Petitioner's counsel 24 hours' notice before removing him to a third country. Dkt. 38 ¶ 5. ICE

would not be required to notify this Court before taking any such action. *See id.* The Ninth

Circuit in *Boardman* found that a stipulation that could be terminated with 60 days' notice could

not overcome the likelihood that, in the absence of preliminary injunctive relief, the plaintiffs

would "suffer irreparable harm before a trial on the merits could be held." *See Boardman*, 822

F.3d at 1023. Here, Respondents' promise is so limited that, even if it were kept, the irreparable

harm could easily occur before Petitioner's counsel could seek relief or obtain a ruling from the

Court. This promise is also entitled to less weight given the incorrect representation in Burns's

first sworn declaration and the government's withdrawal of its earlier voluntary commitment to

follow *Aden*. *See Boardman*, 822 F.3d at 1023; Dkt. 37 at 5, 16 n.7. Petitioner has therefore

shown that he faces likely irreparable harm if the Court does not enter an injunction ordering his

release and barring his unconstitutional removal to a third country.

## D.    Balance of Equities and the Public Interest

The final two *Winter* factors, which involve balancing the equities and considering the

public interest, merge when the Government is a party to a case. *Padilla v. Immigr. & Customs

Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020) (citation omitted). These factors also favor Petitioner.

In cases implicating removal, "there is a public interest in preventing [noncitizens] from being

wrongfully removed, particularly to countries where they are likely to face substantial harm."

*Nken v. Holder*, 556 U.S. 418, 436 (2009). Though there is a countervailing "public interest in

prompt execution of removal orders," *id.*, it is well-established that "our system does not permit

agencies to act unlawfully even in pursuit of desirable ends," *Ala. Ass'n of Realtors v. Dep't of

Health & Hum. Servs.*, 594 U.S. 758, 766 (2021) (citing *Youngstown Sheet & Tube Co. v.

Sawyer*, 343 U.S. 579, 582 (1952)).

Further, if a petitioner shows a likelihood of succeeding on the merits, this too tips the

public interest sharply in his favor because "it is always in the public interest to prevent the

violation of a party's constitutional rights." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (quoting *Melendres*, 695 F.3d at 1002).

## V.    CONCLUSION

For these reasons, the Court GRANTS Petitioner Phong Thanh Nguyen's motion for a preliminary injunction. The Court ORDERS that Respondents and all their officers, agents, employees, attorneys, and persons acting on their behalf or in concert with them:

1. Are ORDERED to immediately release Petitioner Phong Thanh Nguyen from custody under the conditions of his most recent order of supervision;

2. Are PROHIBITED from removing Petitioner to a country other than Vietnam without notice and a meaningful opportunity to be heard in reopened removal proceedings with a hearing before an immigration judge;

3. Are PROHIBITED from removing Petitioner to any country where he is likely to face imprisonment upon arrival.

This preliminary injunction shall remain in effect, absent a successful motion to modify or dissolve it, until this Court issues a final decision on Petitioner's habeas petition. Counsel for Respondents are directed to immediately provide notice of this Order to the restrained parties they represent. Counsel for Petitioner are directed to serve this Order on Respondent Bruce Scott.

Dated this 21st day of August, 2025.

Tiffany M. Cartwright
United States District Judge